UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDEEP SINGH SANDHU,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | No. 2:05-cr-00449-KJM<br><br><br><br>ORDER |

Sandeep Singh Sandhu petitions for a writ of error coram nobis asking the court to vacate his 2013 conviction because his trial attorney allegedly failed to advise him of the deportation consequences of his conviction. Pet., ECF No. 103. The petition is unopposed. On December 11, 2019, the court held a status conference on the matter. *See* ECF No. 111. Counsel Jo-Anna Nieves appeared telephonically for petitioner; Assistant United States Attorney Justin Lee appeared for the government.[1] For the reasons set forth below, the petition is GRANTED and petitioner's conviction is VACATED.

---

[1] At the December 11, 2019 status conference, the government advised the court that its failure to oppose the petition was an oversight. Nonetheless, the government conceded it is within the court's discretion to construe the government's failure to respond as non-opposition to the petition, while noting the court is not thereby relieved of the obligation to consider the petition on the merits.

1

I.  BACKGROUND

On October 20, 2005, a federal grand jury indicted petitioner on two counts of knowingly and intentionally manufacturing at least 100 marijuana plants in violation of 21 U.S.C. § 841(a)(1). Indictment, ECF No. 12. On October 27, 2005, a magistrate judge arraigned petitioner on both counts of the indictment, Arraignment Minutes, ECF No. 16, and on February 6, 2012, petitioner pled guilty before this court to both counts, Plea Agreement, ECF No. 86; Change of Plea Minutes, ECF No. 81. On January 9, 2013, the court sentenced petitioner to a term of imprisonment of time served, 48 months supervised release, a $4,000 fine and a $200 special assessment. Sent'g Minutes, ECF No. 95; Judgment and Commitment, ECF No. 98. Petitioner satisfied each of the sentencing conditions imposed by the court, earning early termination of his supervised release. *See* ECF No. 99 (order approving early discharge of supervised release). Petitioner also agreed to participate as a cooperative witness, but the cases that would have called for his cooperation settled prior to trial. Sandhu Decl. ¶ 19, ECF No. 103, at 9–11.

Because petitioner is not a citizen of the United States, his conviction subjects him to deportation. Pet. at 2. Petitioner alleges he first became aware of these consequences when attempting to return to the United States in 2014, after a brief trip to Canada to participate in a marathon. *Id.* at 4. Upon his attempted return, federal border authorities temporarily detained him and confiscated his green card. *Id.* Since that time, petitioner has been subject to removal proceedings in immigration court, which current counsel represents will assuredly result in his eventual deportation. Thurmond Decl. ¶¶ 13–14, ECF No. 103, at 13–15 (reproducing email exchange with petitioner's current immigration counsel Julian Sanchez).

Petitioner contends his trial attorney in the criminal case before this court neither inquired nor investigated his immigration status, nor did counsel advise him of the adverse consequences his plea and conviction would have on his status in the United States. *Id.* at 2, 6; Sandhu Decl. ¶¶ 21–24. Petitioner says he did not seek the advice of a separate immigration attorney because he was unaware of the consequences of his conviction. Sandhu Decl. ¶ 23. If

1 | he had been fully apprised of the consequences, petitioner asserts he would have held out for a
2 | plea deal protecting him against deportation or taken his case to trial. *Id.* ¶ 22.

Petitioner came to the United States in 1981 with his parents and siblings, when he was eight years old; in 1990 he obtained status as a Lawful Permanent Resident. *Id* ¶¶ 1, 3. He has lived continuously in the United States since first arriving. *Id.* ¶ 5. He obtained his education in the United States and forged a successful career as a computer programmer during this time. *Id.* ¶¶ 8–9. Since his release from federal custody in 2013, he has assumed a lead role in managing and operating his family's businesses in Berkeley and Antioch, California. *Id.* ¶ 10. Petitioner assumed this role because his ailing parents are unable to maintain the day-to-day operations of the family businesses. *Id.* ¶ 11. Moreover, due to their declining health, petitioner serves as caretaker to his parents; he avers they would not be able to live on their own without petitioner's daily assistance. *Id.* ¶¶ 12–13. If deported, petitioner declares not only will he lose the life he has created in the United States, the only country he has called home since age eight, but petitioner's parents will also lose their primary sources of support, including through the loss of their family businesses. *Id.* ¶¶ 13–14, 26.

## II.     LEGAL STANDARD

"[T]he writ of error coram nobis is a highly unusual remedy, available only to correct grave injustices in a narrow range of cases where no more conventional remedy is applicable." *United States v. Chan*, 792 F.3d 1151, 1153 (9th Cir. 2015) (alteration in original) (internal quotation marks omitted). "Specifically, '[t]he writ provides a remedy for those suffering from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact' and egregious legal errors." *Estate of McKinney By & Through McKinney v. United States*, 71 F.3d 779, 781 (9th Cir. 1995) (alteration in original) (some internal quotation marks and citations omitted). Unlike its counterpart 28 U.S.C. § 2255, which provides relief to a petitioner in custody, in the midst of serving his federal sentence, a writ of error coram nobis offers relief "when the petitioner has served his sentence and is no longer in custody." *Id.* (citing *Telink, Inc. v. United States*, 24 F.3d 42, 45 (9th Cir. 1994)).

A coram nobis petitioner bears the burden of showing he is entitled to relief. *Chan,* 792 F.3d at 1153. To do so, he must show: "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character." *Estate of McKinney*, 71 F.3d at 781–82 (internal quotation marks omitted).

III. DISCUSSION

Petitioner contends the circumstances of his conviction and impending inevitable deportation satisfy each element of the coram nobis test and therefore warrant relief. *See generally* Pet. As explained below, in analyzing the four prongs articulated in *McKinney*, the court finds petitioner satisfies his burden to justify granting coram nobis relief.

A. More Usual Remedy Unavailable

A petitioner satisfies this first prong "by establishing that he is not in custody and, as a result, not eligible for habeas relief or § 2255 relief." *United States v. Kwan*, 407 F.3d 1005, 1012 (9th Cir. 2005), *opinion amended on reh'g*, No. 03-50315, 2005 WL 1692492 (9th Cir. July 21, 2005), *and abrogated on other grounds by Padilla v. Kentucky*, 559 U.S. 356 (2010). Here, petitioner was sentenced on January 9, 2013, Sent'g Minutes, and released from federal custody that same day having served by that point the time the parties agreed upon, ECF No. 97 (order of release from custody pursuant to sentence of time served). Petitioner is no longer subject to federal supervision, having been granted early termination of supervised release. ECF No. 99 (order approving early discharge of supervised release based on compliance with all rules and regulations of supervised release). Because petitioner is no longer in custody and his federal sentence has been completed for some time, coram nobis relief is the only remedy available to him. The first prong is satisfied.

B. Reasons for Not Attacking Conviction Earlier

There is no statute of limitations applicable to coram nobis relief, *Telink, Inc. v. United States*, 24 F.3d 42, 45 (9th Cir. 1994); however, a petitioner must still "provide valid or sound reasons explaining why [he] did not attack [his] sentence[] or conviction[] earlier," *Kwan*,

4

407 F.3d at 1012.  While there is no clear definition of what constitutes a "sound" reason, "courts have denied relief on this ground where the petitioner has delayed for no reason whatsoever, where the respondent demonstrates prejudice, or where the petitioner appears to be abusing the writ." *Id.* at 1013.  Coram nobis relief must be denied where a petitioner fails to show he exercised due diligence in filing his petition.  *United States v. Indelicato*, No. CR-85-0078-EMC, 2015 WL 5138565, at *2 (N.D. Cal. Sept. 1, 2015) (citing *United States v. Riedl*, 496 F.3d 1003, 1007 (9th Cir. 2007)), *aff'd*, 677 F. App'x 428 (9th Cir. 2017).

        Here, petitioner asserts he first became aware of the deportation consequences of his conviction in 2014 when he was returning home from Vancouver, Canada after participating in a marathon.  Pet. at 4.  After being detained but then released on a notice to appear, he was then assigned an immigration court date in Seattle, Washington in 2015, after which he "worked diligently" to have his case transferred to the immigration court in San Francisco, California.  *Id.* It was during this transfer process that petitioner first contacted immigration counsel at the office of Thipphavone Ark.  Supp. Sandhu Decl. ¶ 5, ECF No. 113.  While immigration counsel advised petitioner his matter was likely eligible for transfer to San Francisco, counsel also informed petitioner he could not represent him in immigration proceedings until the transfer was complete.  *Id.*; Ark Decl. ¶ 7, ECF No. 112.  On November 22, 2016, petitioner received notice his removal proceedings had been transferred to San Francisco and that his matter was set for hearing on July 3, 2018.  Supp. Sandhu Decl. ¶ 7.  It was not until after the matter was transferred to San Francisco, petitioner secured immigration counsel and his July 3, 2018 hearing occurred that petitioner become aware of the possibility of seeking relief by way of coram nobis.  Ark Decl. ¶ 11.  Shortly thereafter, on or about December 18, 2018, petitioner retained the counsel that has filed the instant petition, the Nieves Law Firm, requesting coram nobis relief.  Supp. Sandhu Decl. ¶ 9.  On May 17, 2019, after extensive research and investigation into petitioner's case, petitioner's counsel filed the instant petition on his behalf.  Pet. at 4; Supp. Sandhu Decl. ¶ 10. Petitioner contends he had no reason to suspect he was subject to deportation prior to his encounter with immigration authorities in 2014, and the government is not prejudiced by the delay, if any, in his filing his petition here.  Pet. at 5.

The court finds no disqualifying delay here. On the one hand, there was a roughly five-year delay between when petitioner first learned of his possible deportation from the federal authorities at the U.S.-Canadian border and when the petition was filed. On the other hand, petitioner did not learn of the possibility that he could seek coram nobis relief until he retained immigration counsel in 2018; it was the Law Offices of Thipphavone Ark, who, after his own investigation, advised petitioner of the potential availability of such relief. *Id.* at 4; *see also* Ark Decl. ¶¶ 6–16 (explaining timeline of petitioner's immigration case and delay typical in immigration proceedings). Shortly thereafter, petitioner retained the Nieves Law Firm, who filed the instant petition within a reasonable period given the investigation the firm needed to conduct. Pet. at 4. This chronology is unlike the scenarios in which courts have found unjustified delay. *See, e.g.*, *Riedl*, 496 F.3d at 1007 (finding delay where petitioner, *inter alia*, provided no explanation why she failed to seek relief prior to deportation); *Maghe v. United States*, 710 F.2d 503, 503 (9th Cir. 1983) (providing no justification for 25-year delay in seeking post-conviction relief); *Kroytor v. United States*, No. 2:03-CR-00379-JAM-CKD-1, 2019 WL 1488740, at *5 (E.D. Cal. Apr. 4, 2019) (finding seven years unreasonable delay, but where petitioner waited that period of time between first becoming aware of immigration consequences of his conviction and retaining legal counsel for purpose of investigating possible collateral relief), *report and recommendation adopted*, No. 2:03-CR-379 JAM-CKD, 2019 WL 2546930 (E.D. Cal. June 20, 2019). Indeed, "[t]he law does not require [petitioner] to challenge his conviction at the earliest opportunity, it only requires [him] to have sound reasons for not doing so." *Kwan*, 407 F.3d at 1014. Here, petitioner's reasons for delay are sound and uncontroverted. *See* Supp. Sandhu Decl. ¶ 12 ("I actively pursued relief in my case as soon as I learned of the potential consequences and remedies—from hiring immigration counsel, requesting change of venue, hiring criminal counsel, and filing the writ."); Ark Decl. ¶ 15 ("Mr. Sandhu did not delay in contacting our office nor was there a delay in requesting a change of venue or hiring post-conviction counsel subsequent to our identification of the issues with the criminal case."), ¶¶ 6–14 (detailing timeline of petitioner's efforts to obtain immigration counsel and noting, as born out by record here, "immigration courts [traditionally] have extensive waiting periods in between hearing dates").

Moreover, there is no indication petitioner raises arguments here, for the first time, that could have been raised in any direct appeal. In *Riedl*, for example, the court found delay where, among the many flaws in her petition, petitioner conceded "she 'could have *possibly* raised the . . . claims in the direct appeal to the Ninth Circuit *or* under 28 U.S.C. § 2255.'" *Riedl*, 496 F.3d at 1006 (emphasis and alteration in original). Here, petitioner did not become aware of the potential deportation consequences of his conviction until 2014, one year after his conviction and sentencing, when stopped upon attempting to return from Canada. Pet. at 4; Supp. Sandhu Decl. ¶¶ 3–4. At that point, any appellate relief was no longer available, *see* Fed. R. App. P. 4(b)(1)(A) (generally providing 14 days to appeal after entry of judgment), nor was § 2255 relief available in 2018 when he became aware of the possibility of seeking coram nobis relief, roughly five years after his release from custody and three years after his supervised release was terminated, *see Kwan*, 407 F.3d at 1012.

In sum, there is nothing in the record to suggest petitioner did not exercise reasonable due diligence in pursuing coram nobis relief, is attempting to abuse the writ process or seeking to prejudice the government in any way. Petitioner provides sound reasons for not seeking relief sooner and so satisfies *McKinney*'s second prong.

  C. Adverse Consequences: Article III Standing

To meet the constitutional minimum of Article III standing, a petitioner must show: (1) he suffered an "injury in fact," which is the invasion of a "legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of[,]" and (3) it must be "likely" that a favorable outcome will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and quotations omitted). "In the immigration context, a sufficient case or controversy exists when a lawful resident's immigration status is revoked and he becomes removeable." *United States v. Hirchedd*, No. 2:99-CR-309-KJD, 2018 WL 6182052, at *4 (D. Nev. Nov. 27, 2018) (citing *Padilla*, 559 U.S. 356; *Kwan*, 407 F.3d at 1014), *appeal dismissed*, No. 18-17355, 2019 WL 2446994 (9th Cir. May 31, 2019).

Here, the threat of petitioner's deportation satisfies Article III standing.  Petitioner has been a Legal Permanent Resident in the United States for many years.  Sandhu Decl. ¶ 3. Because his conviction conduct involved controlled substances and amounted to aggravated felonies, those offenses rendered him removable under the Immigration and Nationality Act ("INA") § 237(a)(2)(A)(iii) and (a)(2)(B)(i).  *See* Thurmond Decl. ¶ 14(c); Ark Decl. ¶¶ 3–5; *see also* 8 U.S.C. § 1227(a)(2)(B)(i) (setting forth deportation consequences of controlled substance conviction).  If removed, petitioner will lose his status as a permanent resident.  The threat of deportation looms as petitioner is currently in the midst of removal proceedings in immigration court, with his next hearing currently scheduled for January 31, 2020.  Thurmond Decl. ¶ 14(e); Ark Decl. ¶ 14; Supp. Sandhu Decl. ¶ 11.  A favorable outcome of his petition here will redress his injury as it will vacate his criminal conviction in its entirety.  *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987) ("[T]he coram nobis writ allows a court to vacate its judgments . . . .").

For these reasons, petitioner satisfies the case or controversy requirement under Article III and the third coram nobis element is met.

### D. Error of Fundamental Character

The "fundamental error requirement" can be satisfied where a petitioner shows he received ineffective assistance of counsel, as he asserts here.  *Kwan*, 407 F.3d at 1014.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth the well-established two-part test to determine whether trial counsel provided ineffective assistance.  First, petitioner must show that trial counsel's performance was deficient.  *Id.* at 687.  Second, petitioner must show counsel's deficient performance was prejudicial to the outcome of his case.  *Id.*  Each of these prongs is addressed below.

#### 1. Deficient Performance

Under the first *Strickland* prong, the court asks, "whether counsel's representation 'fell below an objective standard of reasonableness.'"  *Padilla*, 559 U.S. at 366 (quoting *Strickland*, 466 U.S. at 688).  This "objective standard of reasonableness" is 'linked to the practice and expectations of the legal community," therefore the "measure of attorney

performance remains simply reasonableness under prevailing professional norms." *Id.* When immigration issues are at play, professional norms require counsel to "advise her client regarding the risk of deportation." *Id.* at 367. This standard exists because of the severity of the consequences: "The severity of deportation—the equivalent of banishment or exile—only underscores how critical it is for counsel to inform her noncitizen client that he faces a risk of deportation." *Id.* at 373–74 (citation and quotation marks omitted).

"[W]here the law is 'succinct, clear, and explicit' that the conviction renders removal virtually certain, counsel must advise his client that removal is a virtual certainty." *United States v. Rodriguez-Vega*, 797 F.3d 781, 786 (9th Cir. 2015) (citing *Padilla*, 559 U.S. at 368–69). "Where the immigration statute or controlling case law expressly identifies the crime of conviction as a ground for removal, 'the deportation consequence is truly clear.'" *Id.* (quoting *Padilla*, 559 U.S. at 369). In *Rodriguez-Vega*, for example, "the immigration statute expressly identifie[d] Rodriguez-Vega's conviction as ground for removal[,]" therefore, the law was sufficiently clear and "counsel was required to advise [the defendant] that her conviction rendered her removal virtually certain, or words to that effect." *Id.* (citing 8 U.S.C. §§ 1101(a)(43)(N), 1227(a)(2)(A)(iii)). The same was true in *Padilla*. *See* 559 U.S. at 368–69 (citing 8 U.S.C. § 1227(a)(2)(B)(i) and explaining "Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute . . . .").

Here, as in *Rodriguez-Vega* and *Padilla*, the deportation consequences of petitioner's controlled-substance-related conviction are made express in the applicable statutes. *See* 8 U.S.C. § 1101(a)(43)(B) (listing trafficking in controlled substance as "aggravated felony"); *id.* § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); *id.* § 1227 (a)(2)(B)(i) ("Any alien . . . convicted of a violation of . . . any law . . . relating to a controlled substance . . . is deportable."); *see also* Thurmond Decl. ¶ 14(c) (listing basis for deportation); Ark Decl. ¶¶ 4–5 (same). Therefore, it was trial counsel's duty to explain to petitioner that his guilty plea, and subsequent conviction, made it a "virtual certainly" he would be deported.

9

Petitioner alleges his trial attorney "did not even so much as inquire as to his immigration status, let alone advise him of the possibility of deportation and exclusion." Pet. at 6. Petitioner avers he did not disclose his immigration status because he did not know it was relevant to the proceedings. Sandhu Decl. ¶ 17. He alleges that although the court did advise him during the plea colloquy that "a plea of guilty can affect citizenship status, resulting in denial of naturalization, deportation, or exclusion from this country," Change of Plea Hr'g Tr. at 9:21–25, ECF No. 102, this generic advisement did not obviate counsel of the duty to warn him of the certainty of deportation caused by his guilty plea and conviction, Pet. at 7. Moreover, petitioner argues his affirmative response to the court's advisement was akin to a mere unwitting nod in order to quickly resolve his case and not based on a fully informed decision after consultation with counsel; had he truly known the collateral consequences of his plea, he would have never agreed to the plea offer at all. *Id.*; *see also* Sandhu Decl. ¶ 22.

The factual record regarding trial counsel's conduct consists of the declaration of coram nobis counsel Chelsie D'Malta Thurmond, attached to the petition, which details her efforts to contact trial counsel Johnny Griffin and inquire about his representation of petitioner with respect to the immigration issue. Thurmond Decl. ¶¶ 9–12. According to Ms. Thurmond, the Nieves Law Firm spoke with Mr. Griffin over the phone and he responded that petitioner and his family were more concerned with forfeiture consequences than any potential immigration consequences. *Id.* ¶ 10. Mr. Griffin also believed petitioner had retained an immigration attorney during his case. *Id.* ¶ 11. Beyond these limited details, Mr. Griffin declined to offer further information regarding his representation of petitioner. *Id.* ¶ 12. Ms. Nieves herself confirmed the details of the Thurmond declaration at the December 11, 2019 status conference, where Ms. Nieves, appearing on petitioner's behalf, represented that when her office spoke to Griffin, he understood forfeiture to be petitioner's primary concern and believed petitioner had retained immigration counsel. Nieves further confirmed that Griffin was unresponsive to her attempts to gather further information.

On the record before it, the court finds there is no reason to not accept the representations, however spare, by petitioner and his coram nobis counsel, Ms. Nieves and Ms.

Thurmond. Taken together, the representations support a finding that Mr. Griffin's performance fell below the objective standard of reasonableness. In particular, Mr. Griffin's statement that he believed petitioner had separate immigration counsel signals that he did not take any steps to advise petitioner regarding the immigration consequences of his plea. Mr. Griffin's statements, to the extent he responded in part to coram nobis's counsel's inquiry, are admissible under the residual exception to the hearsay rule. *See* Fed. R. Evid. 807(a).

The residual exception provides that a hearsay statement that does not qualify for the exceptions provided by Rule 803 or 804 may nonetheless be admissible if: (1) "supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). Advisory notes accompanying Rule 807's 2019 amendment advise that the court's "focus for trustworthiness [must be] on circumstantial guarantees surrounding the making of the statement itself, as well as any independent evidence corroborating the statement." Fed. R. Evid. 807, adv. comm. note to 2019 amendment.

Here, although the record is slim, sufficient corroborating evidence exists for the residual exception to apply. The absence of a sworn declaration from Griffin is entirely consistent with coram nobis counsel's assertion that he refused to provide further information regarding his representation of petitioner in the underlying criminal matter. *See* Thurmond Decl. ¶ 12. Here, the government has not opposed the petition, and petitioner has not requested a hearing or discovery to supplement the record; it is highly unlikely Mr. Griffin would willingly provide a declaration in support of the instant petition asserting his inadequate performance. *Cf. Rodriguez-Vega*, 797 F.3d at 785 (noting lower court's directive that the government file a declaration from petitioner's trial counsel). Second, Mr. Griffin's statements have been made a part of the record through the declaration of Thurmond, signed under penalty of perjury, and confirmed on the record in open court by Nieves at the December 11, 2019 status conference. Both Thurmond and Nieves are licensed attorneys bound by a professional duty to make only

well supported representations, and to not to make false or misleading statements to the court. *See* Fed. R. Civ. P. 11; Cal. R. of Prof. Conduct 3.3(a)(1).

Having considered the totality of the circumstances in which Mr. Griffin made his statements to coram nobis counsel and the manner in which those statements are introduced here, the court finds the statements bear sufficient guarantees of trustworthiness as required by Rule of Evidence 807. The court finds the remaining requirements of Rule 807 also satisfied. Petitioner cannot reasonably, on his own, obtain or document additional responses from Mr. Griffin given his unwillingness to provide further information, *see* Fed. R. Evid. 807(a)(2), the government had ample notice of petitioner's intent to rely on Mr. Griffin's statements and yet did not object, *see* Fed. R. Evid. 807(b), and the exceptions available under Rules 803 and 804 do not apply, *see* Fed. R. Evid. 807(a).

Given petitioner's own declaration and Mr. Griffin's statements, which it may consider, the court finds the deportation consequences of petitioner's plea were clear at the time petitioner pled guilty, Mr. Griffin had an affirmative duty to advise petitioner that a guilty plea would render his deportation "virtually certain," and Mr. Griffin did not provide such an advisement. In this respect, Mr. Griffin's performance fell below the objective standard of reasonableness required here and therefore was deficient.

2. <u>Prejudice</u>

To satisfy *Strickland's* prejudice prong, petitioner must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rodriguez-Vega*, 797 F.3d at 788 (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability' is a standard of proof 'sufficient to undermine confidence in the outcome' and is 'somewhat lower' than a preponderance of the evidence." *Id.* (quoting *Strickland*, 466 U.S. at 694). "[T]o obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at 372. "Where ineffective assistance leads a petitioner to accept a plea bargain, a different result means that 'but for counsel's errors, petitioner would

either have gone to trial or received a better plea bargain.'" *Rodriguez-Vega*, 797 F.3d at 788 (quoting *United States v. Howard*, 381 F.3d 873, 882 (9th Cir. 2004)).

Petitioner avers that had he been properly advised of the ramifications of his plea, he would have attempted to negotiate a plea deal that avoided deportation consequences; if such a deal could not be reached, he would have gone to trial. Sandhu Decl. ¶ 22. In support of the proposition that a better plea deal could have been fashioned at the time, and is not merely a figment of the imagination engaged in hopeful hindsight, petitioner offers the position of his immigration counsel, that apart from pleading to a non-controlled substance offense, petitioner could have possibly avoided deportation if he had pled to a lesser misdemeanor offense that was not a trafficking offense or to an offense for possession of a small quantity of marijuana for personal use. Thurmond Decl. ¶ 14(f) (conveying advice from immigration counsel regarding alternative plea agreement possibilities). While these lesser offenses might still have subjected petitioner to removability, they might also have made him eligible to apply for cancellation of removal because they are not classified as aggravated felonies. *Id.*

The court finds these assertions, however, are highly speculative and fail to establish that negotiating a more favorable plea was a reasonably probable option at the time petitioner pled guilty. "A petitioner may demonstrate that there existed a reasonable probability of negotiating a better plea by identifying cases indicating a willingness by the government to permit defendants charged with the same or a substantially similar crime to plead guilty to a non-removable offense." *See Rodriguez-Vega*, 797 F.3d at 788. Petitioner makes no such showing here; he merely relies on the statements of immigration counsel that "[i]deally" he should have pled to an offense unrelated to a controlled substance and one that does not constitute an aggravated felony. Thurmond Decl. ¶ 14(f).

Nonetheless, petitioner can still "demonstrate[] prejudice by showing a reasonable probability that, even in the absence of a more favorable plea agreement, []he would have gone to trial." *Rodriguez-Vega*, 797 F.3d at 789. As the court in *Rodriguez-Vega* explains, "It is often reasonable for a non-citizen facing nearly automatic removal to turn down a plea and go to trial risking a longer prison term, rather than to plead guilty to an offense rendering h[is] removal

13

virtually certain." *Id.*; *Padilla*, 559 U.S. at 368 ("Preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." (alteration and citation omitted)).

Here, petitioner avers without equivocation that remaining in the United States is his paramount concern, and he would have expressed this concern more emphatically at the time he pled guilty had he known the removal consequences of his plea. Petitioner declares that if his "attorney would have told [him] of the [removal] consequences, [he] would not have plead to the charges. Instead, [he] would have . . . insisted on trial." Sandhu Decl. ¶ 22. Petitioner "did not retain or consult an immigration attorney . . . because [he] was not aware that [his] plea could impact [his] immigration status." *Id.* ¶ 23. His personal circumstances at the time of his plea and sentencing are consistent with his position that he placed a high priority on maintaining his lawful status in this country. As noted above, in 1981, at eight years old, he had come to the United States with his parents and two sisters; in 1986 he had obtained status as a Lawful Temporary Resident, and in 1990 he obtained Legal Permanent Resident status; he has lived in the United since his initial entry. *Id.* ¶¶ 1–5. Petitioner's parents and one of his sisters are now residents in the United States, and he completed his primary and secondary education in the United States. *Id*. Since his release from custody in 2013, he has assumed the role of primary caretaker to his ailing parents and overseeing day-to-day operations of the family business, all located in the United States. *Id.* ¶¶ 6–13. Given these circumstances petitioner's statements that "[t]he United States is the only home [he] ha[s] known since [he] was eight years old" and that "everything [] is here in the U.S.," *id.* ¶ 26, do not read as hyperbole. Petitioner's allegiance to his family and commitment to remaining in the United States, while at all relevant times unaware of the risk of deportation, are underscored by his unmitigated commitment to supporting his family even as these proceedings and the immigration matter remain pending. Petitioner has established that absent his trial counsel's deficient performance there was a reasonable probability he would have taken his case to trial if he could not secure a plea deal that protected him against deportation.

Other sister courts have reached the same conclusion on similar facts. In *Robles-Adame v. United States*, for instance, in considering the prejudice prong of the *Strickland* test in

reviewing a § 2255 petition, the court found the petitioner in that case had demonstrated prejudice by showing a reasonable probability of proceeding to trial despite a more favorable plea deal. No. 3:15-CR-01801-GPC-1, 2017 WL 2465017, at *4 (S.D. Cal. June 7, 2017). In doing so, the court weighed the fact the petitioner was only twenty years old when "he pled guilty to an offense rendering his removal virtually certain[,]" that his "life [was] in the United States, not Mexico[,]" his family, including his girlfriend and child, resided in the United States, and he had attended middle school and high school in the United States. *Id.* These factors led the court to conclude "[p]etitioner had much to lose from removal and more incentive to reasonably risk going to trial." *Id.* (citing *Rodriguez-Vega*, 797 F.3d at 789 ("A young lawful permanent resident may rationally risk a far greater sentence for an opportunity to avoid lifetime separation from h[is] family and the country in which they reside.")).

Finally, the court may also find "prejudice where a non-citizen demonstrates clearly that []he placed a 'particular emphasis' on the immigration consequence of a plea in deciding whether or not to accept it." *Rodriguez-Vega*, 797 F.3d at 789 (quoting *Kwan*, 407 F.3d at 1017–18)). A petitioner's inquiries regarding deportation consequences during plea discussions with counsel can demonstrate the "particular emphasis" contemplated by this test, *see id.* at 789–90 (citing *Kwan*, 407 F.3d at 1017), but the absence of evidence showing such focused discussions here is not fatal to petitioner's case given that, as the court has found, counsel did not inform petitioner of the ramifications of his plea and petitioner was ignorant of the great risks of his deportation. Where a petitioner has an extensive personal history in, and substantial familial ties to, the United States, and counsel fails to advise him those ties are virtually certain to be severed upon entry of a guilty plea, petitioner should not be penalized retroactively for failing to inquire about the severity of a risk unknown to him. *See id.* (citing *United States v. Akinsade*, 686 F.3d 248, 255 (4th Cir. 2012) ("We have . . . found prejudice where the defendant, whose counsel misinformed him of deportation consequences, had significant familial ties to the United States and thus would reasonably risk going to trial instead of pleading guilty and facing certain deportation.") (alteration in *Rodriguez-Vega*)). This is particularly so when there is nothing in the record indicating petitioner should have been alert to the high risk of removal and his need to

15

1  express his concerns at that time.  *Compare* Plea Agreement (containing no immigration

2  provision), *with Rodriguez-Vega*, 797 F.3d at 785 (involving plea agreement with provision

3  entitled "Immigration Consequences").  In retrospect, petitioner's traveling to Canada for a brief

4  period, to participate in a marathon, also supports the conclusion that he had no awareness of the

5  risks he faced; he could easily have avoided such a discretionary trip if he had known it might

6  trigger deportation proceedings.  In sum, that petitioner did not specifically inquire about the

7  removal consequences of his plea does not undermine a finding of prejudice here.

### 3. Summary

Petitioner satisfies the two-part *Strickland* test by showing trial counsel's performance was deficient, and but for that deficient performance petitioner would have proceeded to trial assuming he could not have obtained a better plea deal.  Accordingly, the court finds the final element of the coram nobis test is satisfied because trial counsel's error here was of a fundamental nature.

### E. Need for Evidentiary Hearing

An evidentiary hearing is not warranted in this matter as the current record is sufficiently clear to support the court's findings.  The petition for coram nobis relief, declarations of both coram nobis counsel and immigration counsel, the statements of Mr. Griffin, counsel's representations at the December 11, 2019 status conference and the supplemental briefing thereafter all create an expansive record sufficient to justify relief.  Where the record provides sufficient justification for the court to reach a determination, an evidentiary hearing is not required.  *See Rodriguez-Vega*, 797 F.3d at 792 (holding district court did not abuse discretion in failing to conduct evidentiary hearing because record provided adequate basis to decide ineffective performance and prejudice inquiries); *see also United States v. Taylor*, 648 F.2d 565, 573 (9th Cir. 1981) (coram nobis determination without hearing requires "files and records of the case [that] conclusively show that the petitioner is entitled to [] relief").  This conclusion also takes account of the government's failure to oppose the petition despite being ordered to do so.  *See* ECF No. 106 (minute order directing government to respond to petition within fourteen days); ECF No. 107 (petitioner's reply brief noting government's failure to respond).

IV. CONCLUSION

For the reasons discussed, the petitioner has satisfied his burden to obtain the coram nobis relief he seeks. Accordingly, the petition for writ of error coram nobis, ECF No. 103, is GRANTED. Petitioner's January 9, 2013 conviction is VACATED.

IT IS SO ORDERED.

DATED: January 24, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE